Good morning, Your Honors. Good morning. My name is Tim Bechtold here on behalf of the Swan View plaintiffs. What this case asks the Court to is actually pretty simple. It's simply to ask the Forest Service to remove ten culverts and to close the road that had previously been closed prior to this project. Underneath that simple result, of course, is all sorts of legal standards and maneuverings. I thought we could describe to me what these culverts are and how they actually play a role in this case. The role is this. When the Forest Service builds a road, for example, and it crosses a creek, what it does is it places a culvert to allow the creek to run underneath the road. Now, when the Forest Service is obligated under the terms of the Flathead Forest Plan to remove these culverts at the completion of the project so that it can have a decommissioned road. The issue here for snowmobilers is this. Snowmobilers, like skiers, like everyone else, like to be in the spring sunshine. And when they snowmobile in the high country, which, for example, on this last sunny week in Montana, snowmobilers were in the high country because the snow was still there. So to get to the high country, they take these access routes that, if there's a culvert there, allows them to skim easily over what would have been a creek bed. And if there hadn't been a culvert there, they'd have to go down, come up. And at this time of the year, there's snow on each side of the creek, but the creek is running raging. So they can't cross it. So in April, when things start to run off and snow starts to melt, these creeks break up and you can't get to the high country. But if there's a culvert there and there's a road over the creek, you can access over the top of the snowpack and get up into the high country. And the issue there is that this is when the grizzly bears are coming out of their dens. So grizzly bear cubs are born in their dens in the wintertime and they emerge in the spring. And obviously, it's a time of high caloric need for the bears. And the cubs are very small and need quick intake of calories as well. And they need to get someplace where they can get food quickly. Does that mean coming down to lower altitudes? Typically, it means coming down to lower altitudes and then going back up for safety at night. So just like elk, they retreat the snow to sleep and come down to eat. But the issue with grizzly bears is that whenever there's the biggest documented issue for grizzly mortality is human-bear interactions. Bears and humans just tend to get along for one reason or another, particularly when humans have guns. So the way to decrease human-bear interactions is to not provide easy access to where bears are. That's the whole issue here. That's what the Amendment 19 to the Flathead Forest Plan is designed to do, is to make habitat more usable by grizzly bears. Because wherever there's roads, they tend to underuse habitats. So... Well, and you, there's sort of a previous ideation to this case in the sense, and then Amendment 19 came about after, correct? Exactly. Where you prevailed, essentially, with the Ninth Circuit, and then Amendment 19 came about. And what I'm curious about is what authority supports your contention that once the Forest Service adopted Amendment 19, that it could not amend the Flathead National Forest Plan in any way that would negatively impact grizzly bears. What Amendment 19 specifically includes is provision that it must favor the needs of the grizzly bear whenever grizzly bear habitat and other land-use values compete. Moreover, the guideline... But the agency makes its own interpretation of what compete means, which is not the same as what you say compete means, right? And my understanding of what the district court did was it deferred to the agency interpretation of compete and then said you didn't show a negative impact from there. You know, the... Am I kind of tracking what went on here? Mostly, Your Honor. There's this. The important part of the Amendment 19 standards is this. It creates this 19-19-68 standard, whereas it has to be 19% total motorized access density, 19% open motorized access density, 68% core habitat. Those values are determined by the Fish and Wildlife Service and the Interagency Grizzly Bear Committee. So what the Interagency Grizzly Bear Committee said, and these are the bear experts, they said anything below this standard, when you have anything below 19% open and total and below 68% habitat security, any time you get below that security level, grizzly bears will underutilize the habitat. In other words, they will not take advantage of the habitat that's there. So if a grizzly bear is going to underuse habitat whenever it falls below those standards, that means that it's in competition. As long as the densities are greater habitat and less density of growth. That's your definition of competition. How does the agency define competition? The agency doesn't define competition. Actually, what I've got to say is that's actually defined in Amendment 19. Amendment 19 is in the Forest Plan, and that's what the plan says. And that was devised by the Interagency Grizzly Bear Committee, and that was what was adopted wholesale into the Flathead Forest Plan after this court in Resources Limited said either go back to Fish and Wildlife or adopt the guidelines. And the Forest Service said, okay, we'll adopt the guidelines. And that's what the guidelines say. And the district court admitted that fully, that the scientifically determined threshold beyond which road density in the absence of core habitat will result in underuse of habitat by adult female grizzly bears with cubs is those A19 standards. But then the district court went on to say, well, it's not just compete. It has to seriously negatively affect. Now, seriously negatively affect is something that the district judge came up with on his own. There's no basis in the plan. Now, the Flathead Forest Plan says pretty clearly that when the job, the primary goal of the Forest Service is to manage for the recovery of the grizzly bear. That's in the guidelines. That's in the plan. Also in the plan is the directive that whenever the needs of the bear compete, that they have to favor the bear. Now, the guidelines also say that whenever those standards are below those threshold numbers, then they're underusing the habitat. And if they're underusing the habitat, they're clearly competing with something else. Tell me something. Underutilization of habitat, would that fall under the definition of a demonstrable and significant biological threat to the grizzly bears? The grizzly bear are a listed species, which means they're in danger of extinction. Any time that they don't have the habitat they need to survive, it's a threat to their survivability. Okay. Did I miss someplace that indicated that these particular roads somehow were necessary for breeding, feeding, and that sort of thing, things that are essential to their survivability? Other than the fact that there are people with guns, other than that. Granted, that's going to be a serious threat to their survivability. So you're asking about this one road and asking about these ten culverts. I'm just wondering whether or not these culverts and the fact that it provides, well, the fact that culverts are in place provides motorized access and the bears will shy away from these particular areas. Are these particular areas necessary to their survivability? By law, yes. Okay. And as a matter of fact, yes. It's occupied grizzly bear habitat. It's the best place we have in the United States for grizzly bears right now. So, yes. Any time we take away that little slice that they have left, it's knocking them down just a little bit more. As a matter of fact, Your Honor, every year the Grizzly Bear Interdict Task Force has mortality guidelines, mortality targets on which they don't want to go. Those targets have been exceeded eight out of the last ten years. In other words, more bears have died than they need to die in the Northern Continental Divide. And the reason is because of human-bear interactions. Bears get killed by humans more than any other thing else. More bears get killed by humans than die naturally. So as long as we have human-bear interactions, we're going to have bears that die. The agency recognizes this, and that's why A19 is in the plan. It's to try to find a way to minimize human-bear interactions in those places where bears need the action the most. All right. It isn't your position that the culverts have any impact upon these bears during the winter months when the bears are denning. It's in the non-winter months that the existence of these culverts on the road is going to have a negative impact on the survivability of grizzly bears. Precisely, Your Honor. When the bears are denning, it doesn't matter who's snowmobiling. But the issue is snowmobilers don't just snowmobile in the wintertime. Snowmobilers snowmobile more often from February through May when it's sunny and bright out, as opposed to having four-hour days like we do in Montana. So that's the issue, is the conflict between snowmobilers and bears at den emergence time. If the snowmobilers would just snowmobile in January, that'd be great, but that's just not the way it works. Here's what I'm struggling with in terms of just trying to, you know, I want to find out your, my understanding of what the district court did was the district court specifically referenced Swanview's argument concerning the needs of the grizzly bear trumping other uses when the needs compete. And the district court, I believe, proceeded to reject the Forest Service's proffered attempts to justify the road opening and the culverts. Essentially blasted the Forest Service for attempting to find a way around the requirement that it give top priority to the needs of the grizzly bear. But then the next thing that I see the district court do is that the district court concluded that the Forest Service reasonably interpreted the management direction to allow for other uses and that the Flathead National Forest Plan did not require that the Forest Service automatically exclude all uses that might impact the grizzly bear. Then the district court notes that the biological opinion, the mitigation measures, and the fact that the interagency grizzly bear committee task force report allowed public motorized use in the core areas during the denning period all supported that the Forest Service's interpretation. Ultimately, the district court concluded that the Forest Service interpreted the word compete in the management directive to allow for minimal or indirect impacts on grizzly bears. And then as a result, the district court concluded that Swan View had to show that the action would have a demonstrable negative impact on the grizzly recovery. And that's where the court said you failed. Now, this court has to defer to informed discretion of a responsible federal agency. How do I get around all of that and find that that's arbitrary and capricious or whatever? I'm just trying to track what went on, what the district court thought. I mean, the district court obviously didn't think that the government did a perfect job on all of this, but then ultimately came to where the district court thought it had to defer to agency interpretation. What the district court said is it kind of basically said that there has to be serious negative effects. Now, the plan standard doesn't say serious negative effects. What the plan standard says is that whenever they compete, in other words, whenever those 819 standards are violated, then the Forest Service has to take the steps required by the Endangered Species Act to favor the needs of the bear. Now, what the district court said was, well, you know, I can't find out from the record here that this is going to cause the extinction of the bear. That's basically the deal. So, you know, serious negative effects, I don't know what that means. It hasn't been defined by law. It hasn't been defined by cases other than Judge Malloy's ruling here. But what has been defined is what the Flathead Forest Plan says and how the Forest Service is obligated to follow the plan. Whenever there's a plan guideline, the Forest Service has to follow it. The plan here says when the needs compete. And the scientific threshold of when the needs compete has been defined. It's been defined as when the 1919-68 standards of 819 are not met. Therefore, when the Forest Service wanted to make a site-specific amendment here to avoid those standards, it was actually abrogating its duty under the ESA to avoid take of grizzly bears. So whenever it doesn't meet those standards, it is in take of grizzly bears. So, you know, there's nothing wrong with the Forest Service making a site-specific amendment to its plan. Obviously it can. The situation here is that by making these site-specific amendments, it's abrogating its duty under ESA because the obligation of ESA was put upon the Forest Service from Resources Limited to incorporate the grizzly bear guidelines into the Forest Plan. And now those guidelines are the plan. Well, now, are you saying, though, that the agency never adopted a definition of the word compete in the interagency grizzly bear plan? No. They did not? Is your position? There is no official definition of compete. What there is, though, is a scientific definition of the threshold at which bears underuse habitat. And, you know, the common meaning of compete is simply when there's a rivalry for resources. And if bears underutilize habitat, that means there's a rivalry for that resource. So what did the district court say that the agency defined compete as? Actually, it didn't really say what the agency defined compete as. It said it's left to its own to define it as it chooses. Do you want to reserve for rebuttal? I do, Your Honor. Okay. Good morning. Good morning. May it please the Court, Charles Scott from the Department of Justice on behalf of the Forest Service. The only issue in this case arises under NFMA. And the question is whether the Moose Project, including its site-specific amendments to Amendment 19's objectives, was authorized by NFMA and consistent with the remainder of the Forest Plan. As the district court found, the amendments were authorized and consistent. Therefore, there is no NFMA violation. Before addressing the details of specifically the guidelines, I'd just like to rebut Swanlee's charge. The court rejected the Forest Service proffered reasons for opening the road and leaving the culverts. And without these reasons as rationally related reasons for the decision, you know, I mean, the court rejected that. So why aren't we just required to remand this case to allow the agency to submit new reasons? I believe, Your Honor, the court held that it was not arbitrary and capricious for the Forest Service to make these amendments under NFMA. The only command that NFMA imposes, really, it allows any amendment whatsoever. And the command that it imposes is that amendments be consistent with the Forest Plan. And on arbitrary and capricious review, the district court, I will concede reluctantly, found that the agency's decision could not be overturned. In subsequent opinions, the district court has rejected the argument again and upheld site-specific amendments to Amendment 19. And the tone has changed somewhat. I just would quickly like to address the characterization of this project as retarding recovery of the species. The Moose Project unquestionably benefits grizzly bears. Even taking into account its site-specific amendments, it reduces motorized access density, increases security core areas, reclaims 57 miles of road, and shuts down, restricts another 11 miles year-round. The Fish and Wildlife Service, therefore, found that the Moose Project wouldn't not only would not jeopardize grizzlies and not have any adverse effects on their survival and recovery, but would lead to significant habitat benefits. So the characterization of this project as something that's going to harm grizzlies is not supported by the record. And contrary to Swanview's briefs and argument, snowmobile access is not being improved either. The district court said that snowmobile access was being facilitated in that access to certain areas was being allowed to continue, consistent with the terms of the settlement agreement. There is no increase in snowmobile access. What's the benefit to the bear habitat by opening these roads? Benefit to the bear habitat of? By permitting the culverts. Further access. Well, as to the culverts, Your Honor, as you pointed out, the biological opinion for the Moose Project, the harms that these culverts might cause to grizzly bears would be when staff from the forest comes in to perform maintenance on the culvert during the period when grizzlies are out of their dens. And this would happen, I think, approximately once every decade. And the biological opinion therefore concluded that there isn't going to be an adverse effect. Now, Mr. Bechtol has referred to high country snowmobiling into May and I guess even now June. I would like to point out that if you look at the supplemental excerpts of record 46 to 48, snowmobiling on this ten miles of, excuse me, nine miles on which the ten culverts are retained is, I believe, prohibited after March 31st. The denning season, the end of the denning season is about the end of March. So there is not interaction between snowmobiles and grizzly bears on that road system as a result of. So are you telling me that what he said is not in the record? What I'm saying is that in the record, if you look at pages 46 to 48 of the supplemental excerpts, you'll see descriptions of when roads in certain areas are allowed to remain open. And in this area, the roads are on Big Creek Road 316, that 5.29-mile stretch of road, not the culverts. Snowmobiling is allowed until April 14th. On the roads with culverts, it's until March 31st. I think I should probably get into the guidelines. As Your Honor has pointed out, there is no basis for the idea that Amendment 19's percentage-based objectives can't be amended. The National Forest Management Act provides that forest plans can be amended in any manner whatsoever. The implementing regulations, 36 CFR section 219.8, allow for site-specific amendments to these objectives when necessary to bring a project into consistency with a forest plan, which is the case here. The forest plan here also says on page 6, standards that are established for endangered and threatened species may be amended. It does require, however, consultation with the Fish and Wildlife Service and a determination that even once amended, the project will fulfill the ultimate goal of grizzly bear recovery. Now, the Forest Service determined in the Record of Decision and Final Environmental Impact Statement that the moose project would contribute to the grizzly bear's recovery. And the Fish and Wildlife Service, as I've said, determined that not only would there be no jeopardy and no adverse effects on survival or recovery, but that habitat benefits to grizzly bears would be significant from the project. Amendment 19 itself in its decision notice, pages 105 and 106 of the Supplemental Excerpts of Record, specifically says these site-specific, that these objectives may be amended on a site-specific basis if site-specific application reveals unanticipated or impractical results. Now, the guidelines themselves, these interagency guidelines, which are from 1986, do contain the sentence that management decisions will favor the needs of grizzly bear, of the grizzly bear when grizzly habitat and other land use values compete. The Forest Plan at page 10 points out that this is a, quote, broad statement. And while the Forest Plan does not explicitly say this is what compete means, it does point out on exactly how the interagency guidelines of 1986 should be applied. The district court pointed that out. It cited to page, what is now page 12 of the Excerpts of Record and its decision. And it pointed out that when recreation is at issue, the effectively uses only compete when recreational use will have, I want to make sure I get the language absolutely right. While you're looking for that, I have a question. What's the agency, does the agency deny that opening Road 316 to motorized vehicles and leaving the culverts competes with the grizzly bear needs? As to Road 316, the biological opinion states that during the two-month period from July 15th to September 15th when the road is reopened, there may be some adverse effects to grizzly habitat security. The Fish and Wildlife Service in its biop dictated that to compensate for that, another road in the area would have to be closed from April 1st to July 15th, and said that this was in order to improve habitat security during the spring and fall, which are also when hunting seasons are going on. So there is the possibility of adverse effects. The biological opinion found that this did not rise to the level of jeopardizing the bear and required that these terms and conditions be adhered to. I have finally found that language. So there's not a specific definition of compete, but you're saying there's guidance and that's what the district court deferred to? If you look at page 268 of the excerpts of record, which is I think, I'm not sure the page number of the district court opinion. I'll take a look at that. The district court first cites the guidelines for recreation use. Which are, in situations one and two, when recreational use is determined to exceed grizzly tolerance levels as determined through biological analysis, some means or restriction or reduction of human use should be implemented. The implication is that for purposes of the forest plan, the needs of the grizzly bear do not compete with other uses until those uses manifest a demonstrable negative impact. That was the basis for the district court's rephrasing of this into a demonstrable negative impact. In this case, the requisite analysis in terms of what the forest plan requires, determined through biological analysis whether grizzly tolerances would be exceeded, was done through the biological opinion and through the forest service's consultation with Fish and Wildlife Service toward that opinion. And again, it was determined that there would be no jeopardy to the grizzly bear, that there would not be an adverse effect on survival or recovery, and that habitat would be significantly improved. So the final environmental impact statement at page 203 of the excerpts of record states that the moose project is consistent with the guidelines and also cites those pages of the forest plan where the detailed guidance on how to apply the guidelines is present. Even so, even if the guidelines are taken, as Swanview would have it, to make, to be amended in any manner whatsoever, including on a site-specific basis, the forest plan says that. Amendment 19 says that. But even if you thought, well, the guidelines cannot be amended, arguendo, this project was consistent with the guidelines. It favored the need to, it did not favor the needs of, the land uses did not compete within the meaning of those guidelines, because grizzly tolerance levels were simply not affected. Well, okay, if they did compete, then the grizzly trumps, right? If there is a demonstrated negative, I'm sorry, if it is determined that the use exceeds grizzly tolerance levels, then the use must be restricted or reduced. That's what the forest plan says. And that's based on your definition of compete. Well, that is how the forest plan interprets the guidelines. On page 10 of the excerpt of the record, it says, here's the guidance on how to apply the guidelines in a more detailed manner. And on page 12, it says, this is how you do it with recreation. Now, does it say this is what compete means? No, that's not there. But it does say this is how you apply the guidelines. Well, your initial position was that it didn't compete, right? All I mean to say is, I think as the district court found, I think it does show that that's what compete means here. But all I'm saying is, I can't point to you a place in the record saying compete, in quotation marks, means this. What I can point to is, here is guidance on how to apply the broad interagency guidelines in a detailed way. For recreation, this is what you do. And if grizzly bear tolerances are exceeded, then you must reduce or restrict the recreational use. And the tolerance levels is determined by the biological opinion and the ---- Does this compete here? No. Now, as to culverts, for example, Judge Wright asked about that earlier, the only effects on culverts are from once every decade maintenance and repair activities. And I think the biological opinion for the Moose Project said that there would be no effect from the retention of the culverts, because it was looking at what happens during the non-denning period, when the grizzly is out of its den and there can be interactions with humans. I think I should probably just summarize, unless there are further questions. The site-specific amendments here were authorized by NIFMA. They were authorized by the implementing regulations. They were done in a manner consistent with the Forest Plan, which required a formal consultation with the Fish and Wildlife Service and a determination that the amendments the amended standard would still fulfill the overall goal of recovering grizzly. Forest Service made those necessary findings. Amendment 19's decision notice also said these objectives may be amended on a site-specific basis, if there has been formal consultation with the Fish and Wildlife Service. To say that Amendment 19 set in stone these 19 percent, 19 percent, 68 percent percentages to the extent of even barring site-specific amendments to them is inconsistent with the statute, regulations, Forest Plan, and Amendment 19 decision notice. And it also takes an unrealistic view of the nature of forest planning. One of the things that the biological opinion from the Moose Project mentions, this is pages 143 and 153 of the excerpts of record, is that the grizzly bear population seems to be doing better, much better, in the Northern Continental Divide ecosystem than was the case back when the recovery plan was revised in 1993 and Amendment 19's objectives were set out in 1995. There is nothing that specifically says, there's no authority for the proposition that unlike anything else in a forest plan, these Amendment 19 percentages cannot, can never be amended, but are set in stone. And I think unless there are further questions, I'll pause. All right. Well, he's not saying that you can't, your adversary or your, you know, colleague representing the appellants here, I understood him to say that you can make site amendments, but that here, that the grizzly trumps. Is that what, is that his position? I mean, I didn't understand him to say that you can't make site amendments. This one is just problematic. Then I should say that. Maybe I misunderstood that. I'll go back with him. Perhaps I misunderstood. But I will say that if the argument is this, this amendment is problematic, then that is contradicted by the statutory and regulatory scheme, by the terms of the forest plan itself, by Amendment 19's decision notice, and by the biological opinion on these amendments. Overall, the effect of this project, including when the amendments are taken into account, is that grizzly habitat will be significantly improved through these road closures and increases in security core areas. And this, as the Forest Service determined, will contribute to the continuing recovery of the grizzly bear in the Northern Continental Divide ecosystem. Can I just close on 316? Go ahead. I was just looking at the biological opinion discussing the fact that 316 is open during the summer and, I guess, early fall, July through September, that for at least a few summer months and the early fall, that there is going to be a compromise of the grizzly habitat. If I could first clarify that the biological opinion, originally the plan was Big Creek Road 316 is going to be open from July 1st through October 14th. Fish and Wildlife Service said no, make it July 15th to September 14th. And, yes, the BIOP does say that there may be certain adverse effects to habitat security during the summer months then, effects that are mitigated and counteracted by neighboring road closures during the spring and fall hunting seasons. But if we go back to the forest point. Wait, wait, wait. I don't understand how opening other roads during other times of the year mitigates the adverse consequences on the grizzly habitat between July 15th and September 14th. I'm sorry, I was unclear on that. It does not, what it does is by closing a neighboring road from April 1st to July 15th, it improves habitat security during the spring by not allowing Big Creek Road 316 to be open from September 14th through October 14th. These are both conditions of the BIOP that improves fall habitat security. So they don't directly counteract summer habitat issues. But if that road were closed all summer, it would be better for the grizzlies, right? It might overall be better, but, again, if you look at what the forest plan requires in terms of evaluation of the effects of recreation, and if you look at the BIOPS, the BIOPS said there may be some adverse effects to this, that any take from this would be hard to quantify because it might have some limitation on one adult female grizzly's reproductive potential. Maybe it's me. I don't know. That benign euphemism, take, and how we're balancing that between recreational use, it doesn't even seem to be a close question. Why not close the road? Well, Your Honor, the Endangered Species Act prohibition on takes is not a claim in this case. The only question here is whether this amendment is consistent with the forest plan. And I think if you look at what the forest plan says in terms of restricting or reducing recreational use if it's determined to exceed grizzly tolerance levels, and if you look at the biological opinion and the determinations of how extensive the effects will be, then this was a decision that the Forest Service was within the Forest Service's discretion to make, to open this road to provide some access because the grizzly bear, the effects on grizzlies would not exceed their tolerances. Or kill too many of them. I, you know, it wasn't phrased in terms of killing any of them. There was the possibility of one, having Big Creek Road 316 open might provide access for one malicious, illegal killing of a grizzly bear between 2003 and 2009. The BIOP allowed for one. As I have been told from the Forest Service, that has not occurred. And ultimately it comes back to NIFMA's mandate that the forest be managed for multiple use and sustained yield. So recreation must be balanced. I'm sorry. I see that I'm over and I will go. You're going down still. You're still okay. I moved too quickly. You haven't gone over time. The forest plan allows for multiple uses. It says, you know, this is when you limit recreation, for example, when it exceeds tolerances. The statute says forest plans must provide for multiple use and sustained yield, including balancing recreation and wildlife, as well as other activities like timber harvesting, minerals exploration, certainly more invasive perhaps than recreation. So there is a duty to manage the forest to allow for access. The grizzly bear is, as an endangered, as a threatened species, requires consultation with the Fish and Wildlife Service whenever there may be an action that affects it. And the forest plan contains specific provisions saying, listen, if you modify a standard that's there for a threatened species, you have to do more. You have to make sure that you consult and that it will still fulfill your ultimate goal of recovery. But those determinations were made here. Thank you for your argument. Thank you. Your Honors, the excerpt is a record at page 9, talking about how the forester should implement the guidelines. It states at sub-12, human access will be managed to meet grizzly bear recovery goals. The grizzly bear recovery goals are the A19 standards. That is not a discretionary shall or should or anything. I mean, should, ought to, that sort of thing. It says will be managed. The excerpt on page 12 that the counsel was speaking of talks about restrictions on human access. And it says on 12 at sub-3 under recreation management, in situations 1 and 2, that is the two best habitat types, when recreational use is determined to exceed grizzly tolerance levels as determined through biological analysis, some means of restriction or reduction of human use should be implemented. So we have to. I understand your argument on site amendments. The Forest Service can do site amendments, and you got it exactly right. The problem with this site amendment is that it abrogates their duty under ESA, which has been commanded by this court that they have to comply with. So I'd like to address a couple issues. And the first is the recovery goals are the A19 standards. That's what they are. And until those standards are met, then grizzly bears underutilize the habitat. The scientists who comprise the Interagency Grizzly Bear Committee have decided that already. That is the scientific threshold. That is the biological analysis. So if the Fish and Wildlife Service says there's no jeopardy here, what jeopardy means is it's not going to cause the extinction of the bears. It doesn't talk about any beneficial aspect. And you should be aware, too, that in the resources limited case, the Fish and Wildlife Service also gave a no jeopardy opinion. They said no problem. And this court said hold it. No, there is a problem. You've got to do better than that. And the same situation applies here. The Fish and Wildlife Service said, hey, no problem. It's not going to kill all the bears. And this court has to step in and say, hold on. We've got to do better than that. Whenever we have situations dealing with management situation one habitat for grizzly bears, it's a situation where this is the last available place for bears in the United States, essentially. So we don't have critical habitat designation for grizzly bears. We just have this management situation one because the government argued in the Fun For Animals case that we don't need critical habitat because it would be redundant. Now, if this were critical habitat, the Forest Service would be obligated to manage for the recovery of the species, and any adverse modifications to the habitat would have to be taken into account to recover the species. Now, what counsel says is, well, look, this moose project is an incremental step better. It's one step better than it was before. But the forest plan and the law say that one step better isn't good enough. When you manage the place, you have to manage it up to the A19 standards. That's what the plan standards are. That is the biological threshold where the uses of the grizzly bear no longer compete, where they no longer underutilize the habitat. Now, it's not legal to kill grizzly bears, but a lot of them get killed. It's not legal to snowmobile in areas that are closed to snowmobiling. A lot of people snowmobile in closed areas. Whether or not it's okay isn't reflected on the ground. And that's why it's important to have it so it's not easy for you to get to places where grizzly bears are. And that's the whole reason that the scientists who comprise the grizzly bear committee said, we need to make it tough for people to get into grizzly bear habitat, because if a person can drive his ATV in there or drive his snowmobile in there and carry a gun, which many in Montana do just because they do. I've heard that. And you have to encounter a bear. What do you do? Do you defend yourself, or do you take it on the chin? And if you have a gun, most people in Montana tend to defend themselves. And that's what the problem is. And that's why the scientists say, we just have to find a way to make the situation not happen. And the way to make that situation not happen is to prevent the roads from being there in the first place, to prevent the access. And what Swanview is asking this court to do is to tell the Forest Service, look, you know the standards, meet the standards. Until we meet those standards, we're not doing our job of recovery. Thanks. All right. Thank you both for your argument in this matter. It will stand submitted.
judges: Berzon, Callahan, Wright